UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

SEANN PATRICK PIETILA,

    Defendant.
_____/

No. 1:23-CR-00078-01

Hon. Robert J. Jonker
United States District Judge

## GOVERNMENT'S SENTENCING MEMORANDUM

When Defendant Seann Pietila lived in Lansing in early June 2023, he communicated multiple threats to kill and injure Jewish people in Instagram messages to another user named "Limey." When the FBI executed a search warrant on June 16, 2023, agents discovered that Defendant created a note in his cell phone that named the "Shaarey Zedek Congregation," the date "March 15th 2024," the names "Me and Limey," and a list of "Equipment" that included pipe bombs, "molotovs," and six firearms, including a 12-gauge shotgun, pistols, and assault rifles:



The Shaarey Zedek Congregation is located in East Lansing, Michigan. Additionally, agents found another note in Defendant's phone entitled "Suicide note":



Defendant was found at his parents' residence in Pickford, Michigan, where he started residing after he sent the threatening Instagram messages. During the search on June 16, the FBI also found a 12-gauge shotgun and ammunition; .40 caliber pistol and ammunition; a .22 caliber rifle and ammunition; and various bladed weapons that were accessible to anyone in the residence. During a post-arrest interview with the FBI, Defendant admitted that he and "Limey" sent messages on Instagram about murder-suicide plans but claimed he was not actually going to commit a mass attack or commit suicide.

2

### I. The Advisory Sentencing Guidelines Range Of Imprisonment Is 33-41 Months And Defendant's Objection To The Scoring Should Be Overruled.

The Presentence Investigation Report calculated an advisory Sentencing Guidelines range of 33 to 41 months in custody (offense level 20 and criminal history category I). The government concurs with the Guideline calculations.

Defendant objects to a six-level enhancement that is applicable "if the offense involved any conduct evidencing an intent to carry out such a threat." USSG § 2A6.1(b)(1). The Guideline commentary provides that, "the court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole." *Id.*, comment. (n.1). The enhancement is correctly applied, and Defendant's objection should be overruled.

The Sixth Circuit Court of Appeals has found that the enhancement "can only be applied if the defendant engaged 'in some overt conduct in addition to making the threats.'" *United States v. Hagar*, 822 F. App'x 361, 373 (6th Cir. 2020) (citing *United States v. Newell*, 309 F.3d 396, 404 (6th Cir. 2002)). There must be a nexus between the defendant's conduct and the threats that form the basis of the indictment. *Newell*, 309 F.3d at 400; *see also United States v. Wagoner*, 564 F. App'x 780, 782 (6th Cir. 2014) (same). The court in *Hagar* affirmed application of the enhancement where the defendant equipped himself with the means to carry out his threats and conducted

3

reconnaissance. It found "even more bone chilling" evidence that the defendant collected location information on his targets. *Id.*

"The pivotal inquiry . . . is whether the defendant intended to carry out the threat, and the likelihood that he would actually do so." *Newell*, 309 F.3d at 400 (citing *United States v. Gary*, 18 F.3d 1123, 1127-28 (4th Cir. 1994) (holding that any acts that evidence an intent to carry out the threats may form the basis for a § 2A6.1(b)(1) enhancement)). Nevertheless, limitations on a defendant's ability to carry out a threat does not "foreclose a finding that his conduct indicated intent to carry out his threats." *United States v. Nickerson*, 782 F. App'x 377, 380 (6th Cir. 2019). The question is not whether a defendant is physically able to carry out a threat, but whether his conduct demonstrated an intent to do so. *Id.*

In this case, Defendant's overt conduct evidencing an intent to act on his threats includes identification of a particular synagogue in East Lansing (in close proximity to his residence when he communicated his threats to kill Jewish people), selecting a specific date, March 15, 2024,[1] and creating a list of weapons, which included a shotgun that he had access to at his family's residence in Pickford. Additionally, Defendant typed and stored that research and planning information into the "Notes" application in his iPhone. Those are the same type of "bone chilling" actions that supported application of the enhancement in *Hagar*. 822 F. App'x at 373.

---

[1] Defendant told the FBI that March 15 was the day Brenten Tarrant attacked two mosques in Christchurch, New Zealand. (WDMI case no. 1:23-mj-278, R.1-1: Complaint Aff., ¶40, PageID.43.) Tarrant committed the mass shootings on March 15, 2019.

Defendant's conduct has a clear and direct nexus to Defendant's threatening communications on Instagram. Defendant had no other association with that Jewish temple (or any others). He set a specific date in the future. He specifically referenced "Me and Limey," Defendant's nickname for the other Instagram user with whom he was discussing how they would both commit mass shooting events. And his "equipment" list included the types of homemade weapons and firearms that would be useful for killing and maiming people inside of a building.

At least two Instagram messages Defendant sent to "Limey" provide a specific nexus to, and relevant context for, both notes found on Defendant's phone. First, Defendant specifically referenced his "notes app" in connection with firming up his plan to commit a mass attack:

> We'll be the tipping point for others like us. 😎 I haven't put much thought in it yet. But I'm gonna tonight, I'll start putting stuff in my notes app. Then I'll send you it when it's done just gotta check how much I would even be able to fit on my rifle. 🪨

(R.12: Indictment, PageID.59.) Second, Defendant specifically discusses his own suicide in the context of a mass shooting event to avoid being taken alive and references Adolf Hitler's suicide to avoid capture or death at the hands of Allied powers in 1945:

> I'm sure we'll meet again in the next life! This world just sucks ass. 💀 I won't be taken alive I'll make sure of that. Remember "Heil Hitler!" boom red mist 💥 😱 gotta make it unique I guess.

(*Id.*, PageID.57.) Therefore, the notes on Defendant's phone are connected to the Instagram messages in which he communicates threats to kill Jewish people and commit suicide to avoid capture. The government acknowledges that Defendant does

5

not specifically reference murdering others in the suicide note, but the phone notes simply cannot be explained away as entirely unrelated conduct.

The tone of Defendant's messages also supports a finding that the phone notes demonstrate that Defendant was planning to follow through on his threats. "Consideration of the tone of the threats, viewed in conjunction with the defendant's other overt conduct, is proper in determining whether the defendant intended to carry out the threats." *Newell*, 309 F.3d at 403. *Newell* affirmed application of the enhancement based on both the purchase of a handgun in close temporal proximity to the threats and the tone communicated in threatening email and voicemail messages, which contained explicit language indicating an intent to kill a person. *Id.* at 396, 402-404.

The tone of the messages Defendant sent to "Limey" when he refers to the target of his threats demonstrates an intent and desire to act on his threats. In addition to the reference to Hitler avoiding responsibility for the mass killing of Jews during the Holocaust by Nazi Germany, Defendant also wrote:

- I honestly didn't know b.t[2] attacked more than one. 💀 Seriously though, Fucking kikes ruin everything they touch. I'd probably do it on discord for people, so they could screen record and send it to others or post it online.

- I just need a camera for streaming and some more magazines. Don't wanna run out of mags and have to reload one 💀

- Oh for sure I'm taking some homemade Napalm to burn some bodies! I think I heard about that, I just didn't know he went to different mosques.

---

[2] Tarrant's killing of numerous worshippers at two mosques in Christchurch was livestreamed on Facebook. (WDMI 1:23-mj-278, R. 1-1: Complaint Affidavit, ¶10, PageID.29-30.)

6

- That's why I gotta make it mostly my own. Don't wanna seem like a copycat attack. I in all honesty don't have other friends lol. You and my ex are my only friends. 💀 I'm a very anti social Mf. That's why I don't respond all the time. I was planning on just getting some random/trusted people to join my call and record it.

(R.12: Indictment, PageID.57-58, 60.)

The tone of Defendant's messages indicate that he has developed a deep hatred for the people he said he would kill, desired to inspire others to kill Jewish people, and wanted to be glorified by likeminded neo-Nazi sympathizers. Moreover, that tone is consistent over a period of two days' time in messages to "Limey." This is not a case where someone left one threatening voicemail to an ex-spouse in a moment of explosive anger with little or no time for reflection. This is not a case where someone watched a news story and called a politician's office in a rage to express a deep policy disagreement that included a threat. Here, the repeated and consistent tone of Defendant's messages over two days indicated that the planning and suicide notes found on Defendant's phone were substantially and directly connected to the offense and constitute overt conduct evidencing an intent to carry out such a threat.

Defendant may assert that he had limited or no ability to carry out the attack he communicated and planned because he had no driver's license, did not own a vehicle, and was moved back to the Upper Peninsula far from the synagogue in East Lansing. However, the government need not prove that Defendant had the immediate ability to carry out his specific threats and plans at the time of his arrest. Limitations on Defendant's present ability to follow through on his threats is not dispositive. *See Nickerson*, 782 F. App'x at 380.

7

Defendant had set a date nine months in the future and his mother decided to move from Lansing back to Pickford, not him. The fact that Defendant's stated intentions and specific plans were possibly thwarted by an intervening event does not erase the evidence that Defendant took overt acts to identify a location, select a specific date, make a list of the types of weapons he wanted to acquire, and save those plans in his cell phone. Likewise, the fact that the FBI was alerted to his June 2023 messages and quickly interrupted his plot before he took further steps to plan and implement his desire to kill Jewish people does not render his past overt conduct irrelevant. Moreover, when Defendant was moved back to Pickford, he had a goal of getting his driver's license. (R.42: Forensic Psychological Assessment Report, PageID.455.) That Defendant's plans were frustrated by subsequent events does not negate the overt conduct that occurred before June 16, 2023.

**II.    A 33-Month Prison Sentence Is Needed To Sufficiently Punish Defendant, Protect The Community, And Deter Defendant And Others From Committing This Offense.**

The government respectfully recommends a sentence of 33 months in prison following by three years of supervised release. During the period of supervised release, the government requests a prohibition on the use of computers and computer-related devices while on supervision; participation in computer/internet monitoring to the extent he is allowed access to the internet; mental health treatment as directed by his probation officer; and no contact with any Jewish synagogues, including but not limited to Shaarey Zedek in East Lansing, Michigan.

Additionally, on February 20, 2024, the government was advised that the

8

Shaarey Zedek Congregation may seek restitution for increased security measures incurred as a result of Defendant's offense. The Sixth Circuit has held that such expenses may be recoverable under the Mandatory Victims Restitution Act. *See United States v. McNeil*, 744 F. App'x 941, 944 (6th Cir. 2018) (affirming award of restitution for cost of maintaining or improving home security systems during and after offense conduct attributable to defendant). *But see United States v. Wright*, 176 F. App'x 373 (4th Cir. 2006) (vacating restitution order and remanding to recompute restitution without security personnel added after burglary). The government will provide the Court and Defendant with documentation of that reported expense when it is received from the victim.

A prison sentence within the advisory Guidelines range of 33 to 41 months for threatening to kill members of our community because of their race or religion—and taking the additional overt acts of identifying a specific target and date—is sufficient but not greater than necessary to comply with the purposes of sentencing. 18 U.S.C. § 3553(a). A sentence of 33 months in prison reflects the seriousness of the offense, promotes respect for the law, provides just punishment, adequately deters both Defendant and others from making threats to kill or injure, and protects the public from him. A lower sentence, which is recommended by the presentence report investigator and sought by Defendant, would not meet the goals of sentencing in this case.

This is far from a typical federal threats case. Defendant did not threaten one specific individual; his threats targeted an entire class of people. He specifically

9

targeted Jewish people because of their religion or race, expressed a desire to mimic past tragic mass shooting events, and started making plans to act on his threats by identifying where, when, and how he wanted to commit a mass shooting atrocity. And while his threats were not communicated directly to a specific individual, the harm inflicted by his words and actions is just as real and painful to the entire community and particularly to the members of the Shaarey Zedek Congregation. His actions instilled fear on a scale that is more akin to a case involving a disrupted plot to commit an act of terrorism than a typical threatening phone call or letter. As the United States Sentencing Commission has observed, "offenses covered by this guideline may include a particularly wide range of conduct and that it is not possible to include all of the potentially relevant circumstances in the offense level." USSG 2A6.1, comment. (n.4). The totality of Defendant's conduct is significantly worse than the typical threats case this Court has seen over the last several years. This matter calls for significant punishment that will provide specific and general deterrence.

The Defendant's characteristics also call for a significant and meaningful sentence of incarceration. Even if Defendant did not entirely understand or fully appreciate the neo-Nazi movement or antisemitic beliefs as he now claims, the evidence in this case shows he had consumed enough hate speech and propaganda to develop and promote not only a personal hatred of Jewish people but specific desires and plans to commit a mass murder of Jewish people in a synagogue.

Defendant would have this Court believe that the only reason he wrote those messages to "Limey" was to impress him or appear to be someone he was not in real

10

life. The evidence found in his cell phone is inconsistent with such a claim. But even assuming that was true, or at least a motivating factor for his conduct, Defendant's messages have the effect of encouraging and supporting another person to commit a mass terror attack on a class of people because of their race or religion. Such behavior by itself is abhorrent and cannot be countenanced or excused.

Defendant also claims that his offense conducted is mitigated because he did not own the weapons he talked about in his messages with "Limey" or listed in his phone note. However, Defendant had access to multiple firearms and bladed weapons at his residence in Pickford. Those weapons and ammunition were easily accessible to him if he chose to carry it out of the house to use. Despite his desire to accumulate more weapons and make homemade pipe bombs and napalm (a mixture of gasoline and a thickening agent like Styrofoam), Defendant did not need a cache of weapons to injure or kill multiple people inside of a place of worship—any one of those weapons would cause devasting injuries or death to multiple people.

Moreover, Defendant's history of suicidal ideation and his crafting of a suicide note in his phone that contemplated ending his life with the 12-gauge shotgun that was accessible to him, adds to the alarming nature of the offense and the characteristics of this Defendant. Although the government concedes that the suicide note does not refer to killing other people and references an unidentified river, not all murder-suicide plots start and end in the same location. Accordingly, the suicide note is not necessarily inconsistent with the desire to conduct a murder-suicide plot, as Defendant now suggests. The note cannot casually be dismissed as plainly irrelevant.

11

Finally, the presence investigator points to a structural defect in his brain at birth as a potential mitigating sentencing factor that would support a downward variance. However, despite extensive evaluation and a battery of testing by the Defendant's retained licensed clinical/forensic neuropsychologist, the report and conclusions are decidedly mixed. Even though Defendant struggled academically in school, he did not experience any behavioral or conduct problems at any time. (R.42: Forensic Psychological Assessment Report, PageID.452.) Defendant's expert concluded that his general intellectual functioning ability is in the average range compared to other adults his age. (*Id.*, PageID.459.) Defendant does *not* have an intellectual disability. (*Id.*, PageID.461.) The expert determined that Defendant "overreported" emotional distress to a degree that the results are considered invalid and not reliable for an accurate interpretation. (*Id.*, PageID.460)

Perhaps one of the most insightful findings was that, throughout much of Defendant's life, his primary interest has been playing video games and using the internet. Defendant told the forensic examiner that "nearly all his waking hours are spent either playing video games online or spending time on his phone." (*Id.*, PageID.454.) Much of that time evidently involved military and war games, including World War II themes. Defendant purchased an "SS dagger" on eBay, acquired a Nazi flag, and carved a swastika in a piece of furniture. Additionally, Defendant reported using several social media/messaging accounts including Snapchat, Instagram, TikTok, Telegram, Pinterest, and Discord, which he was able to set up and use on his own. (*Id.*) Defendant presented to the forensic examiner as egocentric with behavior

12

driven by immediate reward or gratification. (*Id.*, at 17.) That conclusion is hardly surprising for a 19-year-old who has spent most of his life on the internet playing games, consuming neo-Nazi propaganda, and seeking online-only relationships.

Defendant's behavior and lifestyle choices are incredibly disturbing. It paints a picture of a young man who had no meaningful responsibilities in life and someone who felt he had little or nothing to lose by engaging in violent and self-destructive conduct. Other than working one summer building docks, Defendant has not sought meaningful employment. The evidence indicates that much of his current lifestyle and behavioral choices may have been enabled by the environment in which he was raised rather than a genuine physical inability to live and work a productive and law-abiding life.

The government acknowledges that only the Defendant knows for certain whether he would have gone through with what he was saying and planning. But *certainty* is not the standard for evaluating the facts and evidence to fashion a sufficient sentence to protect the public and punish him for his actions. The preponderance of the evidence supports the conclusion that Defendant started down a path of desiring to kill people because of their religion or race and was interrupted by law enforcement before he was able to act on his desire.

**Conclusion**

This is a serious offense that has harmed the community and has profoundly affected the Shaarey Zedek Congregation in particular. It has been reported that some of its members no longer attend services in the building out of fear and the congregation has incurred additional expense increasing security as a result of Defendant's actions. This Court's sentence should reflect that Defendant not only communicated multiple threats to commit a mass attack on Jewish people because of religion or race, but also picked a specific target near where he lived at the time, a specific date, a list of weapons, and saved those plans in a location where nobody but the FBI, armed with a court-authorized search warrant, would find them.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated:  February 20, 2024

/s/ *Christopher M. O'Connor*
CHRISTOPHER M. O'CONNOR
Assistant United States Attorney
United States Attorney's Office
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404
christopher.oconnor@usdoj.gov